O

1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10

11  ROBIN LAMBERT,                 )  Case No. CV 13-08316 DDP (MANx)
                                    )
12              Plaintiff,          )  **ORDER RE MOTION FOR SUMMARY**
                                    )  **JUDGMENT OR PARTIAL SUMMARY**
13       v.                         )  **JUDGMENT**
                                    )
14  NATIONAL RAILROAD PASSENGER     )  [Dkt. No. 22]
    CORPORATION dba AMTRAK, a       )
15  Company doing business in       )
    California form unknown;        )
16  DIANE PITTS, an individual,     )
                                    )
17              Defendants.         )
    _____     )

18

19       Presently before the Court is Defendants' Motion for Summary

20  Judgment or, In the Alternative, Partial Summary Judgment.  (Dkt.

21  No. 22.)  Having heard oral arguments and considered the parties'

22  submissions, the Court adopts the following order.

23  **I.    BACKGROUND**

24       Plaintiff was employed by Defendant Amtrak as a customer

25  service telephone operator for approximately sixteen years, from

26  September 6, 1996 to June 21, 2012, when she was involuntarily

27  terminated.  (Compl. ¶¶ 8, 15.)  During her employment, Plaintiff

28  was occasionally disciplined for violating Amtrak's policies

regarding attendance, signing on and off the phone system, and taking breaks without authorization from a supervisor. (E.g., Dkt. 23-2 at 170-269 (showing at least 17 disciplinary actions between 1998 and 2010).)

Plaintiff alleges that starting in 2011, she suffered heart palpitations, chest pains, and shortness of breath, possibly as a result of an anxiety disorder. (Id. at ¶¶ 9-12.) Between October 17, 2011, and November 22, 2011, Plaintiff presented Amtrak with (1) a doctor's note stating that she should be excused for certain absences for medical reasons; (2) a doctor's note stating that she should be "allowed to go outside periodically to get some fresh air while at work"; and (3) a request for reasonable accommodations stating that she sometimes lost the ability to breathe while at work and requesting "intermittent time off phone" and permission to "stand-up and/or go outside to get air." (Pl.'s App'x Exs., Exs. 4, 6, 7.) The first note appears to have been rejected by Amtrak because "3 days does not qualify for a medical." (Id., Ex. 5.) Her request for accommodations was forwarded to an "ADA [Americans with Disabilities Act] panel" for evaluation. A "corporate medical director," Paul McCausland, responded to Plaintiff's request on January 12, 2012; somewhat confusingly, he noted both that the medical condition asserted was "feel faint; short of breath" and that there was "no medical condition asserted." (Id., Ex. 9.) He further noted that he "cannot comment in the absence of a medical condition" but also suggested that "flexible work breaks versus timed breaks" might be a reasonable accommodation. (Id.) Dr. McCausland now asserts that recommendation of "flexible work breaks" was not an approval of a reasonable accommodation and was

1  conditioned on Plaintiff submitting additional medical

2  documentation to verify that she suffered from a disability.

3  (Decl. Paul McCausland, ¶¶ 6-7.)  On January 12, 2012, Plaintiff

4  submitted another note from her doctor to Amtrak's ADA Panel; this

5  note stated that Plaintiff "should be allowed to take an outside

6  break for 3-5 min every hour for fresh air."  (Pl.'s App'x Exs.,

7  Ex. 10.)  The note indicated that this should continue "at least

8  until 3/31/12."  (Id.)  On January 24, 2012, apparently in response

9  to the ADA panel's request for additional documentation, Plaintiff

10  submitted yet another note, this one stating that:

11       This patient has been under my care since October of 2011.

12       She's had complaints of shortness of breath and chest pain.

13       The exact etiology has not yet been determined.

14       She has undergone testing that includes an EKG, pulmonary

15       function test, exercise treadmill and chest x-ray.  Additional

16       studies are pending including a sleep study and CAT scan of

17       the chest.  A consultation has also been obtained with a

18       pulmonologist.

19  (Id., Ex. 11.)

20       In deposition testimony, Plaintiff states that she called

21  Amtrak's internal ethics and compliance hotline twice to report

22  that she was sick and had not had an opportunity to meet with her

23  supervisors to discuss her illness or accommodations.  (Id., Ex. 26

24  at 61-62.)  Plaintiff states that she could not remember the exact

25  dates of those calls, but that her best guess was that one occurred

26  in December 2011 and the other occurred in January or February

27  2012.  (Id. at 62.)

28

1    In her declaration and in deposition testimony, Plaintiff
2  states that Malva Reid, also of the ADA Panel, orally approved her
3  request for an accommodation on February 3, 2012. (<u>Id.</u>, Ex. 26 at
4  218, 220; Decl. Robin Lambert, ¶ 8.)  Defendants do not deny that a
5  conversation took place on that date but do not agree that Ms. Reid
6  orally approved an accommodation.  (Mot. Summ. J. at 9 & n.8.)
7  However, Plaintiff states in her deposition testimony that
8  thereafter she would periodically sign out of the phone system
9  using the "medical" code, under the belief that Ms. Reid had
10  approved her accommodation.  (Pl.'s App'x Exs., Ex. 26 at 221.)
11  Plaintiff also testifies that she was instructed to do so by her
12  supervisor.  (<u>Id.</u> at 170, 189.)  On March 29, 2012, Ms. Reid sent
13  Plaintiff a letter seeking documentation of a "diagnosis" so that
14  the ADA Panel could consider her request for an accommodation.
15  (Decl. Jon Hendricks, Ex. A at 157.)  On June 11, 2012, Ms. Reid
16  sent Plaintiff another letter stating that "based on the medical
17  documentation provided, you did not have a diagnosed medical
18  condition."  (<u>Id.</u> at 158.)  The letter further stated that "[u]ntil
19  the ADA Panel receives this medical documentation, you do not have
20  an ADA accommodation and we cannot consider your request."  (<u>Id.</u>)
21  On June 18, 2012, Ms. Reid and Plaintiff exchanged emails as to the
22  documentation required.  (<u>Id.</u> at 160.)  Ms. Reid's email indicated
23  that "the ADA Panel needs to have a medical diagnosis to consider
24  you for an ADA accommodation" and that "[a]ll of the documentation
25  you have sent . . . does not provide a medical diagnosis but only
26  list [sic] symptoms that are unrelated to a medical diagnosis or
27  that you need a break."  (<u>Id.</u>)
28

4

1    Parallel to Plaintiff's efforts to obtain an accommodation,
2    disciplinary proceedings were instituted against her.  In late
3    2011, Plaintiff was summoned to several meetings denominated
4    "Intent to Impose Discipline meetings."  The first letter directing
5    her to appear at such a meeting is dated August 17, 2011;
6    subsequent letters are dated November 20, 2011, and December 16,
7    2011.  (Decl. Diane Pitts, Exs. H-J.)  The letters cite alleged
8    violations of policy beginning in July 2011 and running up to late
9    November 2011.  (Id.)  On December 8, 2011, Amtrak sent Plaintiff a
10   letter directing her to appear at a formal hearing, set for January
11   11, 2012, on the violations that allegedly occurred in July 2011.
12   (Suppl. Decl. Jon Hendricks, Ex. 1 at 4.)  The hearing appears to
13   have been rescheduled several times and eventually held on June 14,
14   2012.  (Id. at 8, 40-43.)  Additionally, on January 10, 2012,
15   Amtrak sent Plaintiff a letter informing her that the company was
16   "activating" twelve days' worth of suspension from work that were
17   not imposed in previous cases, the appeals from which had been
18   heard and decided by March 25, 2011.  (Pl.'s App'x Exs., Ex. 8.)
19       At a June 14 hearing, the six policy violations alleged to
20   have taken place in July 2011 were presented to Plaintiff; all of
21   them were predicated on failure to obtain the permission of a
22   supervisor before stepping away from her phone.  (Suppl. Decl. Jon
23   Hendricks, Ex. 1 at 8-9.)  Plaintiff, in response, stated that on
24   some of the occasions alleged, she had been summoned by her union
25   representative, who, she assumed, would have sought the permission
26   of her supervisor before interrupting her work.  (Id. at 21-23.)
27   This explanation was corroborated by the union representative, who
28   stated that he did meet with Plaintiff on the dates in question and

did ask her supervisor for permission to take Plaintiff off the phone. (Id. at 26-28.)  Plaintiff stated that on the other occasions in question she stepped away from her phone because she was sick and not feeling well. (Id. at 21.)

Another hearing was also held on June 14, 2012, to investigate alleged violations of Amtrak's policies in November 2011. (Pl.'s App'x Exs., Ex. 14.)  At that hearing, Plaintiff stated that all the time away from her phone during November was due to illness. (Id. at 15.)  Plaintiff submitted at least one of the above-mentioned doctor's notes into the record at that hearing. (Id. at 16.)  She also stated that she had made her supervisors aware of her alleged disability and that she believed she had been approved for accommodation by Ms. Reid. (Id. at 16-17.)  A witness on behalf of Amtrak, however, stated that Plaintiff's request for accommodation had been denied. (Id. at 20.)

On June 21, 2012, the hearing officer issued findings, including a finding that Plaintiff failed to comply with Amtrak's policies when she stepped away from her phone without authorization from a "management representative." (Pl.'s App'x Exs., Ex. 16.) Plaintiff was terminated the same day. (Id., Ex. 17.)

On July 17, 2012, Plaintiff's union appealed her termination and the hearing officer's findings. (Id., Ex. 22-23.)  That appeal was denied. (Decl. Diane Pitts, Exs. 1, 2.)  Plaintiff then appealed to the National Railroad Adjustment Board ("NRAB"); that appeal was also denied. (Id., Ex. 3.)  Plaintiff then exhausted her administrative remedies by filing complaints with the California Department of Fair Employment and Housing, which closed the case due to insufficient evidence and issued a "right to sue"

letter.  (Compl., Ex. A.)  Plaintiff filed suit in a California superior court; that suit was then removed to this Court.  (Notice of Removal <u>generally</u>.)

**II. LEGAL STANDARD**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 242 (1986).

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law."  Anderson, 477 U.S. at 248.  There is no genuine issue of fact "[w]here the record taken as a whole could

7

1  not lead a rational trier of fact to find for the nonmoving party."

2  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

3  587 (1986).

4  **III. DISCUSSION**

5  **A.   Third And Seventh Causes of Action**

6       Plaintiff appear to have withdrawn her Third and Seventh

7  Causes of Action.  (Dkt. No. 41 at 123.)  These claims are not

8  asserted or defended in the Opposition.  The Court therefore

9  dismisses these claims.  As the Third Cause of Action was the only

10 claim asserted against Defendant Pitts, she is also dismissed from

11 the action.

12 **B.   Plaintiff's Claim for Disability Discrimination Under FEHA**

13      Plaintiff's First Cause of Action alleges disability

14 discrimination under FEHA.  To prevail on summary judgment, Amtrak

15 must show either that Plaintiff cannot establish one of the

16 elements of a prima facie case of FEHA disability discrimination or

17 that there was a legitimate, nondiscriminatory reason for the

18 adverse personnel actions taken against Plaintiff.  Avila v. Cont'l

19 Airlines, Inc., 165 Cal. App. 4th 1237, 1247 (2008).  If Amtrak

20 does make a showing of a legitimate reason, Plaintiff may

21 nonetheless defeat a summary judgment motion by showing that there

22 is a triable issue of fact as to whether reason is merely

23 pretextual.  Arteaga v. Brink's, Inc., 163 Cal. App. 4th 327, 344

24 (2008).  The burden in a summary judgment motion is on the

25 defendant to show that the plaintiff cannot prevail.  Id.

26 **1.   Prima Facie Case**

27      To establish a prima facie case of disability discrimination

28 under FEHA, a plaintiff must show that "(1) he suffers from a

disability; (2) he is otherwise qualified to do his job; and, (3) he was subjected to adverse employment action because of his disability." <u>Nigro v. Sears, Roebuck & Co.</u>, No. 12-57262, 2015 WL 1591368, at *1 (9th Cir. Apr. 10, 2015).  At the summary judgment stage, the level of proof required is "minimal and does not even need to rise to the level of a preponderance of the evidence." <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1220 (9th Cir. 1998).

**a.  Disability**

A physical disability under FEHA is defined as, inter alia, "any physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss" that affects the "neurological, immunological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, [or] endocrine" system, and that limits a major life activity, which includes working. Cal. Gov't Code § 12926(m).  Plaintiff has clearly stated, and has provided medical documentation to show, that as of at least October 2011 she has suffered from shortness of breath, chest pain, and faintness.  Shortness of breath certainly affects the respiratory system and probably the speech organs as well, and pain affects the neurological system.

Amtrak nonetheless argues that Plaintiff has not established that she suffers from a disability, because she has not shown that her doctor determined the cause of her symptoms or diagnosed her illness, and also because she did not provide Amtrak information as to how her disability affected her ability to work.  (Reply at 6.)

As to the first point, a precise causal diagnosis is not required to show that the plaintiff has a disability.  Shortness of

breath, chest pain, and faintness are "physiological conditions," even if their ultimate cause remains a mystery; Defendant cites no authority suggesting otherwise.  Indeed, to hold otherwise would be to remove from FEHA's protection anyone with clearly defined symptoms whose underlying disease remains unknown.  Given that many pathogens remain unknown, and many systemic diseases remain poorly understood or commonly misdiagnosed, this seems untenable and contradictory to the purpose of FEHA, which sets forth "broad definitions" of physical disability and protects even employees who merely have a "potential" disability or are "erroneously or mistakenly believed" to have a disability.  Cal. Gov't Code § 12926.1.[1]

As to the second point, although Amtrak's knowledge is more properly considered under the third, causal prong, it is true that Plaintiff must show that her disability limits her ability to

---

[1]At oral argument, Amtrak cited <u>Brundage v. Hahn</u> for the proposition that disability must be "the only inference possible" from the symptoms presented.  But, first, Amtrak misstates the holding and posture of <u>Brundage</u>, in which the defendant employer "[did] not contest that Brundage suffered from a disability."  57 Cal. App. 4th 228, 236 (1997).  The "only reasonable interpretation of the known facts" language, <u>id.</u>, applies to the question of the employer's *knowledge*, where the employer would be required to *infer* a plaintiff's disability, rather than being told of it directly. (In <u>Brundage</u>, the plaintiff took an emergency leave of absence due to mental illness and never returned.  The defendant employer knew only of the absence and had no notice of the plaintiff's symptoms.) Second, whether the facts demand a conclusion that a disability existed will frequently be an triable issue of fact.  This is true regardless of whether a doctor has made a diagnosis: for example, a doctor's diagnosis might be called into question by a plaintiff's fraud on the doctor or by competing opinions as to plaintiff's disability after a defendant's discovery exam.  On summary judgment, it cannot be the case that the plaintiff is required to show that there is no alternative explanation of the facts. Rather, the rule is that a defendant must show that plaintiff *cannot* show that she has a disability.  <u>Avila</u>, 165 Cal. App. 4th at 1247.

1  pursue some major life activity.  Cal. Gov't Code § 12926(m)(1)(B).

2  The relevant activity here seems to be working, although it would

3  appear that speaking might also be affected by Plaintiff's alleged

4  disability.  Plaintiff's submissions to Amtrak in support of her

5  request for accommodations set forth, at least in broad strokes,

6  the alleged limits on her ability to work and to speak.  The

7  doctor's letter dated November 14, 2011, stated that she needed

8  occasional breaks to "go outside . . . to get some fresh air."

9  (Pl.'s App'x Exs., Ex. 6; see also id., Ex. 10 ("This pt should be

10  allowed to take an outside break for 3-5 min every hour . . . .").)

11  Her request form stated that she needed "a few minutes to catch

12  [her] breath," and that she needed to "stand-up and/or got outside

13  to get air."  (Id., Ex. 7.)  She also stated that "as I'm talking

14  it gets harder and harder to breath[e]."[2]  (Id.)  As Amtrak

15  requires employees to be on the phone except for scheduled breaks,

16  lunch, and very small amounts of "personal shrinkage time," (Decl.

17  Diane Pitts, Ex. A), it is obvious that a disability that requires

18  taking short, unscheduled breaks could affect Plaintiff's ability

19  to perform her duties in accordance with Amtrak's policies.

20  Additionally, Plaintiff's own statement of her condition suggests

21  that it progressively interferes with her ability to speak.  Given

22  all this, a rational jury could find that Plaintiff suffered or

23  suffers[3] a disability within the definition provided by FEHA.

---

25  [2]At oral argument, Amtrak argued that shortness of breath
could be caused by, for example, running hard.  Plaintiff's
26  narrative, however, suggests that exertion was not the cause of her
alleged symptoms.

27  [3]Defendants allege in multiple places that Plaintiff's
condition resolved itself by March 31, 2012.  (E.g., Mot. Summ. J.
28  (continued...)

11

**b.   Whether Plaintiff Was Otherwise Qualified for Her Job**

A person is not "otherwise qualified" for her job if she cannot perform the "essential duties" of her job with reasonable accommodations by the employer.[4]  Cal. Gov't Code § 12940(a)(1). Because this is Amtrak's motion for summary judgment, Plaintiff need not prove conclusively that she could have done so.  Rather, it is up to the employer to show that she could not.  Avila, 165 Cal. App. 4th at 1247.

In this case, Amtrak has not shown that Plaintiff could not perform the essential duties of her job with reasonable accommodation.  Amtrak's standard for its phone operators is apparently 97.2% productivity.  (Pl.'s App'x Exs., Ex. 27 at 214 (deposition testimony of Diane Pitts explaining the standard).) Records show that, at least as to the two months for which she was disciplined, her average productivity was 96.9%, and on most days she exceeded the standard.  (Id., Exs. 1 & 2.)

---

[3](...continued) at 10.)  The record does not necessarily support this contention. Plaintiff's doctor's note of January 19, 2012, stated that she would need accommodation "at least" until March 31, 2012. Plaintiff stated in deposition testimony that she was able to manage her condition without accommodation after March, (Decl. Jon Hendricks, Ex. A at 122-23), but it is not clear that the condition actually resolved itself.  Rather, the evidence suggests that Plaintiff (1) learned how to manage the anxiety that triggered some of her physical problems and (2) resigned herself to living with a certain amount of pain.  (Id. at 121-22.)

[4]The parties occasionally seem to use this prong as an opportunity to litigate the question of whether Plaintiff was or should have been subject to discipline for failure to follow policy.  (E.g., Opp'n at 19.)  That question, however, seems to be more appropriately examined at a later stage, when the inquiry is whether a defendant had a legitimate, nondiscriminatory reason for taking the adverse action against the plaintiff.  The "otherwise qualified" inquiry is directed toward a capacity to fill the functions of the job, not whether Plaintiff actually did so.

12

Additionally, Plaintiff was employed at Amtrak for sixteen years, a fact which tends to suggest that she performed her essential duties adequately.  She was also employed as a lead agent at one point.  (Decl. Jon Hendricks, Ex. A at 17.)  Defendant has presented no evidence to show that Plaintiff could *not* perform her duties.  Defendant has not shown that a rational jury could not find Plaintiff capable of performing the essential duties of her job with reasonable accommodation.

**c.   Whether Plaintiff Suffered an Adverse Employment Action as a Result of Her Disability**

This prong is sometimes broken down into two parts: whether the plaintiff suffered an adverse employment action, and whether "some . . . circumstance suggests discriminatory motive." Guz v. Bechtel Nat. Inc., 24 Cal. 4th 317, 355, 8 P.3d 1089, 1113 (2000). Plaintiff clearly suffered adverse employment actions – suspension, disciplinary hearings, and termination.  Thus, the primary question whether the facts suggest discriminatory intent.

California courts have "acknowledged the difficulty of proving intentional discrimination," especially in the case of an institutional employer.  Arteaga v. Brink's, Inc., 163 Cal. App. 4th 327, 342, 77 Cal. Rptr. 3d 654, 666 (2008).  Thus, in the prima facie case, the focus is often on whether the employer knew of the disability.  See Avila, 165 Cal. App. 4th at 1246-47; Faust v. California Portland Cement Co., 150 Cal. App. 4th 864, 887 (2007). See also Brundage v. Hahn, 57 Cal. App. 4th 228, 236-37 (1997) (using knowledge as the determinative factor in a case under FEHA's federal sister statute, the ADA).  "If an employer disclaims actual knowledge of the employee's condition, an employer can still be

13

found liable for disability discrimination in cases where knowledge of a disability can be inferred." Jadwin v. Cnty. of Kern, 610 F. Supp. 2d 1129, 1179 (E.D. Cal. 2009).

In its briefs, Amtrak argues that the information Plaintiff provided Amtrak was insufficient to put anyone on notice that she was disabled, and that no one actually did regard her as disabled. However, the factual record shows that there is a genuine factual dispute on this point. At a minimum, there is Plaintiff's own declaration and deposition testimony that she told her supervisors that she was disabled, that they knew she was disabled, that she took breaks coded as "medical" without anyone questioning it, and that she called an ethics and compliance hotline to complain that she was not being accommodated. (Decl. Robin Lambert; Pl.'s App'x Exs., Ex. 26.) A plaintiff's own testimony, even if self-serving, can serve as the basis for a finding of a genuine dispute where it is "based on personal knowledge, legally relevant, and internally consistent." Nigro, 2015 WL 1591368, at *2. Particularly when combined with Plaintiff's multiple submissions of documentation of her medical needs from her doctor, Plaintiff's evidence is sufficient to allow a rational jury to conclude that Amtrak generally and her supervisors in particular knew of her disability.

Nor can it be said, as Amtrak suggests, that the adverse personnel action was not "because of" the disability because the disciplinary decision-makers did not have notice of her disability. First, if the supervisors who knew that she was disabled set the disciplinary process in motion, and they were motivated by animus, that is sufficient to impute the motive to the company. Poland v. Chertoff, 494 F.3d 1174, 1182 (9th Cir. 2007) (holding that a

"subordinate's bias is imputed to the employer" if "the biased subordinate influenced . . . the decision or decisionmaking process," and citing cases).   On this record, it appears that at least some supervisors who may have known of Plaintiff's disability were involved in setting the disciplinary process in motion.[5]   One supervisor made the decision to "activate" previously-unimposed discipline on Plaintiff in January, 2012.[6]   It is also possible, although unclear in the record, that those supervisors were involved in the decision to terminate Plaintiff.[7]

Second, in this case, the decision-makers were explicitly put on notice that Plaintiff had a disability and that the disability was the reason for at least some of her supposed infractions. Plaintiff's alleged disability was discussed at her hearings, (Pl.'s App'x Exs., Ex. 14 at 15-17), and it was even noted in the hearing officer's findings that Plaintiff "had medical conditions

---

[5]For example, Dee Ruiz, Plaintiff's manager, states that she initiated discipline against Plaintiff. (Decl. Dee Ruiz, ¶ 7.) Ruiz disclaims knowledge of the disability. (Id.)  But this is contradicted by Plaintiff's deposition testimony that she talked to her supervisors, including Ruiz, about her disability and her attempt to get an accommodation. (Decl. Jon Hendricks, Ex. A, Part 1 at 23.)  The Court declines to decide that one of these stories is more credible than the other. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

[6]Decl. Dee Ruiz, ¶ 2 (Ms. Ruiz was "responsible for implementing discipline already assessed . . . by a manager after the employee was found guilty"); Decl. Jon Hendricks, Ex. A, Part 3 at 373 (letter imposing discipline signed by Ms. Ruiz).

[7]Compare Pl.'s App'x Exs., Ex. 19 (termination letter signed by Yolanda Mentz, cc'ing Diane Pitts and Dee Ruiz), with Decl. Jon Hendricks, Ex. A, Part 1 at 128 (Plaintiff asserts in deposition that it was Diane Pitts who made the final decision to fire her).

that caused [her] to exceed the Shrinkage Policy." (<u>Id.</u>, Ex. 16;
Decl. Diane Pitts, Ex. M.)  Notably, Plaintiff does *not* need to
prove that anyone at Amtrak believed that her medical issues were
legally considered a disability:

> [A]n employer knows an employee has a disability when the
> employee tells the employer about his condition, or when the
> employer otherwise becomes aware of the condition, such as
> through a third party or by observation. *The employer need*
> *only know the underlying facts, not the legal significance of*
> *those facts.*  Accordingly, whether defendant knew alcohol
> abuse is considered a "disability" is of no consequence here.
> It is sufficient that defendant knew plaintiff had an alcohol
> problem.

<u>Faust v. California Portland Cement Co.</u>, 150 Cal. App. 4th 864, 887
(2007) (quoting <u>Schmidt v. Safeway Inc.</u>, 864 F.Supp. 991, 997
(D.Or. 1994)) (internal quotation marks omitted) (emphases added).
<u>See also</u> <u>Jadwin v. Cnty. of Kern</u>, 610 F. Supp. 2d 1129, 1179 (E.D.
Cal. 2009) ("Liability for disability discrimination does not
require professional understanding of the plaintiff's condition. It
is enough to show that the defendant *knew of symptoms raising an*
*inference that the plaintiff was disabled*.") (emphasis added).

A rational jury could therefore conclude that the decision-
makers at Amtrak either had direct knowledge of Plaintiff's
disability or disciplined her in a process set in motion by or
influenced by supervisors who had knowledge.

Consequently, Defendant has not shown that Plaintiff cannot
make out some element of a prima facie case.

///

16

## 2.   Legitimate, Nondiscriminatory Reason

Amtrak may nonetheless prevail on its summary judgment motion if it can show that it had a legitimate, nondiscriminatory reason for pursuing its adverse employment actions against Plaintiff *and* that Plaintiff cannot convince a rational jury that its reason is a mere pretext for discrimination.  <u>Arteaga</u>, 163 Cal. App. 4th at 344.

Amtrak presents a reasonable case that it had a legitimate, nondiscriminatory reason for investigating, and ultimately terminating Plaintiff.  Amtrak asserts that it fired Plaintiff for violating a policy that required her to seek a supervisor's permission before taking unscheduled breaks.  One of the disciplinary hearings that ultimately resulted in her being terminated was for alleged policy violations that occurred in July 2011, and Plaintiff received notice of impending discipline for those violations in August 2011 – well in advance of when Plaintiff sought out medical care for her alleged disability.  (Decl. Robin Lambert, ¶ 5.)  Additionally, Plaintiff's long history of being disciplined for minor violations could suggest that the company had presented her with plenty of opportunities to shape up before finally determining that she should be terminated for failing to adhere to policy.

## 3.   Pretext

Amtrak having made a sufficient showing that it could have had a legitimate, nondiscriminatory reason for taking the adverse actions, the burden is on Plaintiff to demonstrate that the reason is merely pretextual.  <u>Hanson v. Lucky Stores, Inc.</u>, 74 Cal. App. 4th 215, 224 (1999).

1      Pretext may be inferred from the timing of the discharge
2      decision, the identity of the decision-maker, or by the
3      discharged employee's job performance before termination.
4      Pretext may be demonstrated by showing that the proffered
5      reason had no basis in fact, the proffered reason did not
6      actually motivate the discharge, or, the proffered reason was
7      insufficient to motivate discharge.

8   Hanson, 74 Cal. App. 4th at 224 (citation omitted) (internal
9   quotation marks and ellipsis omitted).  Plaintiff's evidence may be
10  direct or circumstantial and must be sufficient to meet the summary
11  judgment burden.  Cornwell v. Electra Cent. Credit Union, 439 F.3d
12  1018, 1028-29 (9th Cir. 2006).

13      In this case, there are several grounds on which a rational
14  jury could find that the proffered reasons for the adverse actions
15  are pretextual.

16      First, the jury might find that Amtrak's policy itself is
17  inherently discriminatory, either on its face or as applied in
18  practice.  See, e.g., Roby v. McKesson Corp., 47 Cal. 4th 686, 695
19  (2009) ("McKesson's attendance policy operated to the disadvantage
20  of employees who, like Roby, had disabilities or medical conditions
21  that might require several unexpected absences in close
22  succession.").  In that case, disciplining an employee for failure
23  to adhere to policy would itself be discriminatory and therefore
24  pretextual.  This is related to the "essential duties of the job"
25  inquiry discussed above.  Amtrak argues that it fired Plaintiff for
26  violation of policy, *not* for being unable to meet the company's
27  performance standard.  But if an employee can meet the performance
28  standard despite being in technical violation of policy, *and* if the

18

policy itself disfavors the disabled, then the policy is merely a
pretext for weeding out the disabled for reasons unrelated to the
employee's essential duties, and it cannot serve as a legitimate,
nondiscriminatory reason for the adverse actions.

Plaintiff's long history with the company, including her
disciplinary history, would seem to cut both ways as evidence.
Although that history might convince a jury that she was a
discipline problem, it might just as easily convince a jury that
these supposed infractions were nothing out of the ordinary, that
Amtrak had a highly rigid disciplinary system that routinely called
employees on the carpet for minor offenses, that such offenses were
not termination-worthy, and that the only thing that had changed in
this situation was Plaintiff's disability.

Amtrak argues that it had a non-discriminatory reason to
terminate plaintiff independent of her alleged disability, because
she was disciplined in part for events occurring in July 2011,
before Plaintiff sought medical assistance.  But Plaintiff has
testified at deposition that she began to experience symptoms as
early as July.  (Decl. Jon Hendricks, Ex. A at 46.)  That testimony
may be self-serving and not credible, but that is a determination
for the jury to make.  It should also be borne in mind that there
were adverse personnel actions beyond just the termination.
Amtrak's mysterious resurrection of previously-unimposed
suspensions after Plaintiff revealed her disability and asked for
accommodations, as well as Plaintiff's being subjected to
disciplinary hearings and their findings of non-compliance with
policy (especially as to the November violations), were adverse
actions separate from the final decision to terminate.

1     Moreover, the hearing for the July 2011 violations was held on
2  the same day and with the same parties as the hearing for the
3  November 2011 violations.  If Plaintiff is correct that the
4  November violations, at least, were solely the result of her
5  disability and should not have been considered violations, then a
6  rational jury could find that the hearing on those violations was
7  prejudicial as to both the findings in the hearing on the July
8  violations and the final termination decision.  A rational jury
9  could also find circumstantial evidence of animus in the fact that
10  the hearing officer seemed entirely unwilling to accept Plaintiff's
11  explanation for most of the alleged July violations – namely, that
12  her union representative had pulled her off duty, and that she had
13  a good-faith belief that he had obtained supervisor permission.
14  Plaintiff's explanation was bolstered by the union representative's
15  testimony that he had sought permission.  It is possible, of
16  course, that the hearing officer did not find Plaintiff's witness
17  credible.  But it is also possible that a jury could find he was
18  motivated by animus and determined to find that she had violated
19  the policy regardless of evidence to the contrary.

20     The jury might also find that Amtrak fired Defendant *both*
21  because she violated policy *and* because of discriminatory animus.
22  "In such cases, a plaintiff may prevail on a FEHA claim by proving
23  that discrimination was a substantial factor motivating a
24  particular employment decision, even if the decision was also based
25  on non-discriminatory criteria."  McInteer v. Ashley Distribution
26  Servs., Ltd., No. EDCV 13-0268 JGB, 2014 WL 4105262 (C.D. Cal. Aug.
27  19, 2014) (internal quotation marks omitted).

28

1       In short, Plaintiff presents credible circumstantial evidence

2   sufficient to create a triable issue of material fact on the

3   question of Amtrak's reason for taking the adverse actions against

4   Plaintiff.  <u>Arteaga</u>, 163 Cal. App. 4th at 344.

5   **C.   Failure to Engage in the Interactive Process and Provide**

6   **     Reasonable Accommodations**

7       Plaintiff's Fourth and Fifth Causes of Action assert that

8   Amtrak failed to engage in an "interactive process" with Plaintiff

9   to attempt to reach a reasonable accommodation for her to work with

10  her disability, and also that no such accommodation was made.

11  **1.   Interactive Process**

12      Under FEHA, an employer must "engage in a timely, good faith,

13  interactive process with the employee or applicant to determine

14  effective reasonable accommodations" for her disability.  Cal.

15  Gov't Code § 12940(n).  "When a claim is brought for failure to

16  reasonably accommodate the claimant's disability, the trial court's

17  ultimate obligation is to isolate the cause of the breakdown and

18  then assign responsibility so that liability for failure to provide

19  reasonable accommodations ensues only where the employer bears

20  responsibility for the breakdown."  <u>Nadaf-Rahrov v. Neiman Marcus</u>

21  <u>Grp., Inc.</u>, 166 Cal. App. 4th 952, 985 (2008).

22      Here, a rational jury could find that Amtrak was responsible –

23  at least in part – for the breakdown in the interactive process.

24  Plaintiff's evidence shows that she submitted multiple doctor's

25  notes and filled out Amtrak's form requesting an accommodation.

26  Plaintiff's own testimony, which a jury could find credible,

27  asserts that she engaged in phone conversations with the ADA Panel

28  in order to obtain an accommodation.  Plaintiff and Amtrak agree

1   that the reason Plaintiff was not granted an accommodation was

2   because the ADA Panel demanded a "diagnosis," although it was aware

3   of her symptoms, the work limitations they imposed on her, and her

4   need for occasional short breaks in order to continue working.  As

5   discussed above, an employer cannot demand a "diagnosis" where it

6   has knowledge of symptoms giving rise to an inference of

7   disability.  Where an employer makes unreasonable demands before

8   providing reasonable accommodations, the employer may be held

9   responsible for the breakdown in the interactive process.

10   Nadaf-Rahrov, 166 Cal. App. 4th at 986 (denying employer summary

11   judgment because "a jury could find that Neiman Marcus's demand for

12   a medical release before it would reengage in the interactive

13   process was unreasonable").

14      A rational jury could therefore find that the breakdown in the

15   process originated with Amtrak, and that Amtrak should be held

16   responsible.

17   **2.   Reasonable Accommodation**

18      Under FEHA, an employer must "make reasonable accommodation

19   for the known physical or mental disability of an applicant or

20   employee." Cal. Gov't Code § 12940(m).  An employer is not

21   required to make an accommodation that would "produce undue

22   hardship" to the employer.  Id.

23      Amtrak provides no evidence showing that Plaintiff's requested

24   accommodation (or some other accommodation) would have caused it

25   hardship.  Instead, Amtrak argues that it was not required to

26   accommodate Plaintiff because she was the cause of the breakdown in

27   the interactive process.  (Mot. Summ. J. at 21.)  As discussed

28

1    above, however, a rational jury could come to a different

2    conclusion on that point.

3        Amtrak further argues that "Plaintiff cannot establish that

4    she had any need for the reasonable accommodation requested,"

5    because she actually took breaks from work at least from February

6    3, 2012, to March 31, 2012. (Id.) But Amtrak's argument seems

7    contrary to the public policies embodied in the FEHA.  Surely even

8    before the FEHA was enacted, there were occasionally employees who

9    on their own initiative *took* accommodations that their employers

10   were unaware of or chose not to punish.  The point of the statute

11   is to require employers to formally provide reasonable

12   accommodations – not to leave it up to employees to seize whatever

13   accommodations they can get away with.

14       Additionally, a jury could find that some or all of

15   Plaintiff's alleged policy violations should have been excused

16   based on her disability.  Amtrak appears to argue that this would

17   amount to requiring a retroactive accommodation. (Id. at 21-22.)

18   But that is not so.  The disciplinary hearing occurred in June

19   2012, long after Amtrak had whatever notice it had of Plaintiff's

20   alleged disability.  At a minimum, a rational jury could find that

21   Amtrak should have reasonably accommodated Plaintiff's disability

22   in June 2012 by not holding her responsible for the alleged policy

23   violations.

24   **D.   Retaliation**

25       Plaintiff's Second Cause of Action alleges that she was

26   retaliated against, in violation of FEHA.  A claim for retaliation

27   under FEHA follows the same analytical pattern as a claim for

28   discrimination:

1    [T]he plaintiff must show (1) he or she engaged in a protected

2    activity; (2) the employer subjected the employee to an

3    adverse employment action; and (3) a causal link existed

4    between the protected activity and the employer's action.

5    Once an employee establishes a prima facie case, the employer

6    is required to offer a legitimate, nonretaliatory reason for

7    the adverse employment action.  If the employer produces a

8    legitimate reason for the adverse employment action, the

9    presumption of retaliation "drops out of the picture," and the

10   burden shifts back to the employee to prove intentional

11   retaliation.

12   Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1042 (2005).

13       Amtrak argues that Plaintiff did not engage in a protected

14   activity, because requesting an accommodation is not, in itself, a

15   protected activity.  That is true: under FEHA a protected activity

16   is defined as "oppos[ing] any practices forbidden under this part."

17   Cal. Gov't Code § 12940(h).  However, Plaintiff's calls to the

18   ethics and compliance hotline to complain of what she perceived as

19   stonewalling in providing her accommodations easily satisfies the

20   first prong.  Plaintiff has also stated in her deposition testimony

21   that she filed internal grievances against Diane Pitts and Dee

22   Ruiz, her supervisor and manager.  (Decl. Jon Hendricks, Ex. A,

23   Part 1 at 141.)  Plaintiff can also establish adverse actions, for

24   all the reasons discussed above.

25       Where Plaintiff's evidence is thinnest, however, is in showing

26   a causal link between her complaints and the adverse actions

27   against her.  She has not provided direct evidence that her

28   supervisors were aware that she made the calls or filed the

grievances.  It is surprising that no records of Plaintiff's calls
to the hotline or other formal complaints are in the record at this
point – especially given that Defendant does acknowledge that some
calls took place and some grievances were filed.  (Mot. Summ. J. at
18.)  Nor has either party placed into the record any evidence of
Amtrak's internal investigation of the complaints.[8]

Nonetheless, although the evidence is thin, it is sufficient
to allow a rational jury to infer that Ruiz and Pitts had knowledge
of at least some opposition to the company's failure to
accommodate.  First, although direct evidence of an internal
investigation of Plaintiff's complaints is not presented, a jury
might infer that such an investigation took place, or that
Plaintiff's supervisors were otherwise alerted to Plaintiff's
opposition to their policies and acts, based on Plaintiff's
testimony that she called the ethics and compliance hotline and
lodged formal complaints through the grievance process.
Plaintiff's testimony on this point is reasonably specific; she
gives approximate dates, details of what discriminatory/unlawful
practices she alleged, and gives the name of a person she
complained to.  (Decl. Jon Hendricks, Ex. A, Part 1 at 123-24, 139-
41.)

Second, Plaintiff presents at least some testimony that she
directly confronted her supervisors about what she believed to be
discriminatory acts.  She specifically says that she complained to

_____

[8]Plaintiff suggests that no such investigation took place,
(Opp'n at 22), but that does not help Plaintiff's retaliation
claim; if Amtrak conducted no investigation, that seems to make it
*less* likely, not more, that Ms. Ruiz and Ms. Pitts knew that
complaints had been filed against them.

1   Dee Ruiz and Gloria Stackhouse, another supervisor, that she was

2   being disciplined differently from others because she was sick.

3   (<u>Id.</u> at 137.)  She also states that she complained to Ms. Pitts

4   that her "medical" decision and her disciplinary hearings were

5   being handled differently from those of others.  (<u>Id.</u> at 135-36.)

6        Against this self-serving testimony, of course, the jury must

7   weigh the affirmative (if also self-serving) testimony of Ruiz and

8   Pitts that they did not know of any complaints and did not initiate

9   discipline against Plaintiff for retaliatory reasons.  (Decl. Dee

10  Ruiz, ¶ 7; Decl. Diane Pitts, ¶ 10.)  The jury may also consider

11  the lack of evidence of an internal investigation that might have

12  tipped Ruiz and Pitts to the existence of Plaintiff's formal

13  complaints.  Nonetheless, taking all evidence in the light most

14  favorable to Plaintiff and drawing all inferences in her favor, the

15  Court finds that Plaintiff can present at least some evidence

16  raising an inference that her supervisors knew of overt acts of

17  opposition to alleged FEHA violations.  Thus, she may proceed with

18  her retaliation claim.

19  **E.    Failure to Prevent Discrimination/Retaliation and Wrongful**

20  **       Termination in Violation of Public Policy**

21       Amtrak argues that Plaintiff's Sixth and Eighth Causes of

22  Action, for "failure to prevent" discrimination and retaliation and

23  for wrongful termination in violation of public policy, fail

24  because the underlying claims fail.  (Mot. Summ. J. at 22-23.)

25  This is true as to the retaliation claim, but not as to the

26  discrimination claim, for reasons discussed above.  Therefore,

27  these claims survive inasmuch as they rest upon the underlying

28  discrimination claim.

**IV.   CONCLUSION**

Plaintiff's Third and Seventh Causes of Action are dismissed. Defendant Pitts is dismissed from the case.  Defendant Amtrak's motion for summary judgment is DENIED as to the remaining Causes of Action.

IT IS SO ORDERED.

Dated: April 29, 2015

DEAN D. PREGERSON
United States District Judge